## TEXAS & N. O. R. CO. v. GALVESTON COUNTY.

No. 11348.

Court of Civil Appeals of Texas. Galveston.

March 12, 1942.

Rehearing Denied April 2, 1942.

Baker, Botts, Andrews & Wharton, of Houston, and Armstrong, Cranford, Barker & Bedford, of Galveston, for appellant.

Charles H. Theobald, Co. Atty., and Emmett F. Magee, Asst. Co. Atty., both of Galveston, for appellee.

GRAVES, Justice.

In this suit appellant sought to recover of appellee $5,302.59 as the total amount of money it had previously expended in the defense and settlement of three lawsuits that had been brought against it by several individuals for its alleged injury of one person and the killing of two others while it was engaged in operating the drawbridge on the Galveston County causeway over Galveston Bay; the three persons had at the time of the occurrence been travelling on the county road over the causeway, and ran their automobile into the open drawbridge space, when the drawbridge was up, which precipitated the car into the water beneath.

The Railroad's cause of action was grounded upon a lease-contract between appellant and several other railroads, running over the causeway, and the appellee, whereby they each agreed to operate this lift-bridge in consideration, among other things, of Galveston County's agreeing to indemnify and save harmless anyone of the railroads from any liability for any injury to person, or damage to property, that might occur in such use or attempted use of the drawbridge, or in the open space left by its being open, when the person or the property damaged was in the course of travel or transportation over such county road on the causeway.

That contract, which bore date of December 15, 1908, was expressly authorized by an Act of the 31st Legislature of Texas, Chapter 87 of Local and Special Laws, and, as required by both the terms of the contract itself and those of such authorization of it by the Legislature, was further approved by the Railroad Commission of Texas on February 3 of 1909.

The learned trial court having heard the cause, without a jury, on an agreed stipulation of all material facts, rejected the Railroad's claim, in this terse declaration: "And it appearing to the Court, and the Court being of the opinion, that said agreement on the part of Galveston County to indemnify and save harmless the railroads in the particulars in question constitutes a lending of the County's aid and credit to the railroads, and is violative of Sec. 52, Art. 3, of the Constitution, Vernon's Ann. St. and, therefore, void and unenforceable."

The sole question the appeal presents, therefore, is whether or not that holding was correct. This court believes it to have been. The particular provision of the contract, which, by its terms, was to run 999 years, beginning with 1908, was this:

"(g) Each of the parties of the second part assumes all liability, if any, on account of the derailment on the Causeway or in the draw-space when the draw-bridge may be open, of any of its trains, engines or cars, and will indemnify and save harmless each of the other parties hereto from any such liability. The party or each of the parties of the third part (if there be more than one) assumes all liability, if any, on account of the derailment on the Causeway, or in the draw-space when the draw-bridge may be open, of any of its trains, engines or cars, and will indemnify and save harmless each of the other parties hereto from any such liability. Neither the parties of the second part nor the party or parties (if more than one) of the third part, nor any of them, shall be liable for any injury to person or damage to property which shall occur in connection with the use or attempted use of the draw-bridge, or in the draw-space, when the draw-bridge may be open, when the person injured or the property damaged shall be in the course of travel or transportation over the county road, and the County will indemnify and save harmless each of the other parties hereto from any such liability; provided, however, that this clause shall not apply to collisions between persons or vehicles and trains, engines or cars of the Interurban Company on the draw-bridge."

The applicable portion of the Constitution, Article 3, Section 52, is: "Sec. 52. The Legislature shall have no power to authorize any county, city, town or other political corporation or subdivision of the State to lend its credit or to grant public money or thing of vatue (value), in aid of, or to any individual, association or corporation whatsoever, or to become a stockholder in such corporation, association or company."

At first blush, it will be noted—nor is any contention made to the contrary—that this contract did not come within any of the specified exceptions (a), (b), and (c), of quoted Section 52, under which a County may issue bonds or otherwise lend its credit for certain designated purposes in any amount, not to exceed one-fourth of the assessed valuation of the real

property therein; hence, it is just a straight-away question of whether to "indemnify and save harmless" the Railroads in the particulars and circumstances plainly set forth in quoted Section (g) of Article 10, supra, constitutes a lending of Galveston County's aid and credit to them. To this court such an undertaking seems to be in the teeth of and to directly contravene the clear-cut declaration to the contrary; this Railroad, while as a matter of course, in some features and circumstances, its business became affected with a public interest, was a private corporation, wherefore what was agreed to be done here was just another name for granting public money or things of value in aid of or to a corporation for its individual and corporate benefit while in pursuit of its business as such, which did not encompass any governmental function whatever. That this express prohibition of the Constitution is a mandatory one is fully shown in such authorities as 49 Tex.Jur., par. 14, and Mitchell v. Hancock, Tex.Civ.App., 196 S.W. 694.

Indeed, these two separate interests, that is, the private one of the Railroad Company as a carrier of people and freight for hire, and that of the County in its governmental function of maintaining a public road for vehicular traffic, were distinctly separated in two ways: (1) The causeway itself was so constructed for the benefit of the Railroads that they operated their trains over one part of it, while the other part was used by the County for the vehicular traffic of the general public; (2) the total cost of so maintaining it was apportioned between all the parties participating, in an agreed percentage thereof, as is set out in Article 4 of the same contract; not only so, but such separate uses and functions were otherwise recognized and provided for, as appears in further paragraph (e), Article 10, of the contract, under which the County was to pay one-fifth of the cost of the lift-bridge for maintenance, operation, and repairs, while the other four-fifths thereof was to be paid by the Railroads.

■ Moreover, the appellant Railroad, with the admitted acquiescence of the appellee County, paid out the $5,302.59 in acknowledgment to the payees that it had been negligent towards them—that is, the parties to the three suits—in having so operated the lift-bridge in the given circumstances as to wrongfully injure and damage them in the aggregate sum it now seeks to recoup from the County.

In other words, the effect of the agreement, to put it more bluntly, would seem to be that the County thus directly, unconditionally, and without any provision looking to the levying and collecting of a tax out of which to pay it, undertook to indemnify the Railroad Company against the negligence of its own operatives for 999 years.

When looked at from that perspective, if its effect was to create a "debt" against the County, thereby making all taxable property within it potentially, at least, liable for its repayment, it also ran afoul of Article 11, Sections 5 and 7 of our Constitution, banning transactions of that sort.

That this contractual obligation in its far-flung reaches constituted ultimately a mere synonym for "debt", within the meaning of this Article 11, whatever fine distinctions in other settings may have been made in some of our decisions, does not seem debatable, under these authorities: Stevenson v. Blake, 113 Tex. 103, 113 S.W.2d 525; City of Cleburne v. Gutta Percha & Rubber Mfg. Co., Tex.Civ.App., 127 S.W. 1072; City of Corsicana v. Mills, Tex.Civ.App., 235 S.W. 220; 30 Tex.Jur., pp. 439 and 440, par. 246; 11 Tex.Jur., pp. 668, 669 and 670; Panhandle Const. Co. v. City of Spearman, Tex.Civ.App., 83 S.W.2d 425; J. I. Case Threshing Machine Co. v. Camp County, Tex.Civ.App., 218 S.W. 1.

As indicated, there was in this instance no pleading nor proof that any provision or tax levy had been made to take care of any contingencies or liability that might result for the County from the contract when it was entered into.

This cause, therefore, is not thought to be ruled by the holdings appellant relies upon, like that by this court in Seydler v. Border, 115 S.W.2d 702, 704, writ of error refused.

Appellant quotes this declaration from that opinion as a cache where the principle it depends upon may be found: "In other words, both before and since the amendment in 1904 of this section 52, our courts seem to have uniformly construed it as placing a restriction upon the power of the Legislature to authorize counties and cities to gratuitously grant public money, or so lend their credit, to or in aid of any individual or private commercial-enterprise."

But that declaration did not end with a period, as quoted, there being a comma in its stead, with this conclusion of the sentence as a whole: "but not as interdicting them from raising money by bond-issues

for such a public and humanitarian purpose as relieving the sick, by the operation themselves of such hospitals as the one herein contemplated."

In other words, the decision in that case, et id genus omne, which constitute appellant's indispensable reliance, did not turn upon a legal equivalent of the given facts here—quite the contrary, since it was simply held that there was no constitutional prohibition, expressed or necessarily implied, against the Legislature's authorizing the establishment of county hospitals for the care of the sick, hence its plenary power remained to authorize such a measure in safeguarding the public health; whereas, in the present instance there are these express inhibitions which have left the Legislature no discretion in this matter —that is, there was under this contract and its approving statute a plain authorization to the giving away of public money, as well as its application to other than governmental purposes, by the direct agreement that Galveston County's taxes for nearly 1,000 years in the future be set apart to take care of the consequences of the negligence of the Railroads, while pushing their own private affairs.

Further discussion is deemed unnecessary, since these conclusions determine the merits of the appeal; they require an affirmance of the trial court's judgment. It will be so ordered.

Affirmed.